MARCARIO GONZALES V. THE STATE.

*No. 381. Decided March 14.*

**1. Rape—Special Instructions.**— See special instructions requested by the accused on a trial for rape, with regard to the manner in which the jury were to consider and weigh the testimony of the prosecutrix, and charging them to acquit in the absence of direct evidence or corroborating circumstances, *held*, clearly upon the weight of testimony, and violative of the inhibitions of the statute in that respect.

**2. Same — Uncorroborated Evidence of Prosecutrix.** — On a trial for rape, the question as to whether or not the prosecutrix has been corroborated is one appertaining to the effect and sufficiency of the evidence, and is not a question of law.

**3. Same — Expert Testimony.** — On a trial for rape, it was not error to permit a physician to testify to an examination of the prosecutrix made by him more than two months after the alleged rape, and his discovery by said examination that the vagina had been entered by the male organ, or some foreign substance.

**4. Same—Evidence Offered in Rebuttal, when.—Practice on Appeal.**—Article 661 of the Code of Criminal Procedure expressly provides that the court shall allow testimony to be introduced at any time before the argument of a case is concluded, if it appear that it is necessary to a due administration of justice. *Held*, the exercise of discretion in allowing such evidence will not be revised on appeal unless it reasonably appears that it has been abused.

**5. Bill of Exceptions, Requisites and Sufficiency of.**—A bill of exceptions as to the exclusion of evidence, to be entitled to consideration, must be so full and explicit that the matters presented for revision may be understood without recourse to inference. Inferences will not be indulged to supply omissions in a bill of exceptions.

**6. Misconduct of Juror as to Statements in Jury Room.**—Where it appeared that the statements made by a juror to his fellows with regard to his knowledge of the good character of the prosecutrix, were not made until after the jury had unanimously agreed upon the guilt of defendant: *Held*, that inasmuch as such statements could have had no possible effect in procuring the verdict, it presented no reversible error.

**7. Conflicting Evidence—Practice on Appeal.**—Where the evidence is sufficient, but is directly conflicting as to the guilt or innocence of the accused, the court on appeal will not interfere with the verdict.

APPEAL from the District Court of Bexar. Tried below before Hon. G. H. NOONAN.

This appeal is from a conviction for rape, wherein the punishment assessed is imprisonment for a term of twenty-five years in the penitentiary.

The evidence for the State is fully shown by the testimony of the prosecutrix, Paula Boeck, which is as follows: My name is Paula Boeck. I live down by San Juan Mission. I was 15 years old last August. I know Marcario Gonzales; he is sitting right over there. (Witness points out defendant.) He is my brother-in-law, and has been married to my sister

about three or four years. I have known him ever since he has been married to my sister. My father is not living. I have one little brother living, but my grown brother is dead. My mother is living, but she is a widow. I was going home with Marcario Gonzales on the night of the 25th of August, 1893. My sister was at her mother-in-law's, and I started on with him (Marcario Gonzales), and it was right late that evening, and I was going home with him because my mother told him to bring me home on Saturday, and he said he would have no time to bring me home Saturday, but would bring me home Friday. My mother had instructed him to bring me home Saturday. It was before sundown that he started home with me, and we started on foot. I was walking with him. He said there was a young man going to meet me and speak a few words with me before I went home (a young man I was engaged to), as he could not come where mamma lived, because she had run him away; and so we went on and went by the place where he told me the young man would come, and we went there and waited a good while. That was in the direction of my mother's house. We waited there and the young man did not come, and it was beginning to get late, and I said to him, " Let us go on, because it is getting so late, and the young man had not come;" and we went on. It was not dark yet, but nearly dark, and we went on and walked into a pasture. We walked along in the pasture, and in the direction I supposed was my mother's house, and walked into the dry creek, and out of it, and back into the same dry creek again, apiece further up. There were some bushes and things in the creek, and I said, " How are we going to walk through this creek; what creek is this?" And he said, " This is a creek that runs down from the railroad."

We walked on apiece, and he turned round and said, " Paula, do you remember what I told you the other night?" and he said, " I am going to do it to-night." He said, " I brought you here to do this, and I am going to do it;" and I commenced to scream. He said, " I am going to fulfill my vow." I threw one of my bundles one way and another the other, and he told me to hush, and I screamed and screamed, and he came up and put one of his arms around my neck and one hand over my mouth. I could not tell you which one. He put one of his arms around my neck, and drew his pocket knife, and told me if I screamed he would kill me and throw me into the river, as he did one man before. The place we were in was a dark place, for it was night and in the bed of a dry creek. Then he threw his arm around my neck and put one of his hands on my mouth—the hand of the same arm that he had around my neck—and he held a pocket knife up and said he would kill me and throw me in the river if I would not give up to him. He said he would do me like he did that man that he killed and threw into the river. That certainly frightened me very bad, and I kneeled down before him and begged him not to ruin my life. He said he did not care; there was no use of my beg-

ging, and he would kill me if I tried to get away. I got down on my knees and begged him not to ruin me, and he would not listen. He said it would not do me a bit of good to beg; nothing would do me any good. He said he would fulfill his wish; and he did, in this instance, accomplish his wish; and he penetrated my person with his privates and gratified his wish there under those circumstances. That was in Bexar County, and State of Texas, on the 25th day of August, 1893.

Cross-examined: August 25, 1893, came on Friday, and I am certain that this occurrence took place on Friday, the 25th. I can not be mistaken about the day of the week, nor can I be mistaken about the day of the month. I am certain that it was on Friday, the 25th of August, 1893. I could not tell you what time of night it was. It was about 8 or 9 o'clock; something like that. It might have been later than 8 o'clock, but it was more or less about 8 or 9 o'clock. I could not tell you positively whether it was before 9 or not, and I do not know whether it was as late as 9 or not. It was more or less about 8 or 9 o'clock. To the best of my knowledge, the hour was between 8 or 9 o'clock. My father's name was Julius Boeck. He is dead. My mother's name is Carolina Boeck. My father is dead. He was married at the time of his death. I have known defendant since he has been married to my sister, which was three or four years ago. I have stayed at their house with them a few times before this year. The defendant's wife's name is Clara, and she is my sister. I could not tell you about when was the first time I went there this year, because I did not keep the time. I often went there with Marcario and my sister together, but I could not tell you whether he carried me there alone the first time I went there, or not. I do not remember the first time he carried me to his house. He never carried me alone in a wagon from the woolen mill to his house. I do not remember whether he carried me alone from my mother's house the first time I went there, or not. I went there this year to pick cotton, but I don't remember whether the first time was the 14th or 15th of June or not. I do not remember the date. I remember once when he carried me there alone in an express wagon. I do not remember when I went home after that first visit this year. I could not tell you whether it was in July or not, nor do I know whether he carried me home or not.

I expressed a wish to go home on Tuesday, the 22nd of August, and he said he was going to carry me home, and he started with me, but he did not carry me home. He told me he was going to take me home, and we started home, and he insulted me that night. He carried me into a pasture and insulted me in that pasture. He did not take me in the same direction that he did on Friday night. He did not carry me in nearly the same direction and to nearly the same spot on Tuesday night that he did on Friday night. He did not carry me to that same dry creek, and I did not ask for water. I could not tell you how far it was from where

this outrage occurred to where he took me on Tuesday night. I could not approximate it, for I don't know how far it was. I don't know whether it was in the direction of my home or not. I did not know where I was going. I thought he was going to carry me home. I could not tell you where it was; it was in a pasture, but I could not tell how far it was. It was not in the same pasture. I don't know in whose pasture this occurrence took place on the 25th of August, and I don't know whose pasture he took me in on Tuesday night. He insulted me three times that night; he repeated it right there two or three times that night. I could not tell you how far I was from my home on Tuesday night when we were in that pasture. It was on the other side of the Salado, but I don't know how far. The Salado is three or four miles, more or less, from his house. He told me he wanted to carry me through the pasture, because the people might talk about it if we walked home, if he did not carry me home in some express wagon, and he did not have any. He did not tell me that Narcisso wanted to see me on the night that he insulted me. He insulted me three times on Tuesday night. After that we walked back to his home.

I did not tell my sister that he insulted me that night, because he forbade me to tell her; he told me not to tell her on account of Narcisso having paid him to insult me. He said, "You little fool, do you think I would harm you?" and he laughed at me. He said Narcisso had paid him to insult me, and I was engaged to Narcisso. We were to be married in three months. My mother was opposed to that marriage; she did not want me to marry him. Narcisso came to Marcario's house sometimes, but Marcario was not in the habit of making arrangements for Narcisso and myself to meet at his house, that I know of; they may have arranged it together. I don't know as Narcisso visited me there; he came there as he always did before, but he and I never had any conversation together there. My mother objected to our marriage. I don't know whether my mother was angry at Marcario for permitting him to allow me and Narcisso to meet at his house. I do not know whether my mother threatened this defendant with personal injury if he permitted Narcisso to meet me at his house.

By saying that he insulted me, I mean that he asked me to yield to his desires; to do something wrong. That was on Tuesday night, and three nights afterwards I took a similar trip out in a pasture at night; I took the trip to go home; I did not have any other way to go home. I did not go into the same pasture with him; it was another one. We had to cross the railroad to get into the pasture we went in on Tuesday night. I do not know how far it was from the river, but he threatened to throw me into the river. I guess the river was close by. His house is quite a little ways from the river, but it is close to where his mother lives. His mother lives about a mile or a mile and a half from where he lives. He

insulted me three or four times on Tuesday night, and on Friday night I went into the pasture again with him going home. He told me to tell my sister, Clara, that we did not go home on Tuesday night because we got lost. He did not tell me on Tuesday night to tell my sister we met a friend. On Friday night I took a similar trip with him, and this occurrence took place then. After that we went back to his home.

On Tuesday night, when we started home, we did not pass the French lady's house. We crossed the railroad the first time on Tuesday night, and on Friday night we walked apiece along the railroad. After he had raped me I went back to his house. His wife was then at his mother's, and I stayed at his house all night. I had no other place to stay. There was only one room in the house, and only one bed. I slept on the bed and he slept on the floor, on a mattress. I made the mattress down for him, myself. I did not go to sleep right away; I stayed awake a good while. I was examined here on the habeas corpus trial. I said on that trial I made the bed for him, and laid down and went to sleep, but I could not tell you how long I stayed awake. He did not insult me any more after we got home that night; he said nothing improper to me at all. He threatened me that if I ever said anything about what he did to me, he would kill me; if anything was ever mentioned about this thing, he would kill me as sure as the world. He said, '' When your sister comes home, tell her that Pedro Tafoya came and stayed so late that we could not go home, and we stayed there all night; but don't ever mention what has happened to you, because I will kill you as sure as the world.''

This Frenchman is the nearest male person living around there besides Marcario, but I don't know his name; I never heard it. I do not know the French lady's name. I have been at his house, but I do not know their names. I have not been there very often. Marcario and my sister rent from these French people. I have been at their house several times, and I knew the French lady. On one occasion I received a letter from the French lady from my mother. I am friendly with the French people. There are several other houses around there besides these French people. I know Pablo McLean. Delgado also lives around there. They do not live so very far from Marcario; about a half or three-quarters of a mile or a mile. The French people's house is not over a quarter of a mile from Marcario's house. Pablo McLean lives about a mile, more or less, from Marcario.

I did not tell my sister anything about this when I met her, because I could not. I never told anybody about what happened to me, because he threatened to kill me if I told it. I do not know whether I remained at his house until the 31st of August, or not, from the 25th. I stayed until Thursday of the next week. I stayed there with Marcario and his wife from Friday until Thursday of the next week. I wrote a letter home on Saturday morning, to ask my mother whether I could stay

there; that they would bring me home either on Monday or Tuesday. I did not want to stay there, but he threatened to kill me. I wrote to ask whether I could stay there because they could not take me home. In this letter I did not say anything about what this defendant did, because he stayed right there and I read the letter to him. I can write German and English. Marcario does not read English. I did not write about it in English, because I was afraid my mother would come out there, and then he would kill me. I sent this letter by the French lady. I do not know what her name is. She brought letters to me and I sent letters by her, but I called her madame all the time. The French lady gave me a letter one Sunday afternoon, and told me she was instructed not to give it to Marcario, but to give it to me in person. The letter was from my sister who lives on Government Hill. Friday was the time this thing happened, and on Saturday morning I wrote a letter home asking them to let me stay until Monday or Tuesday; and on Monday they would not take me home, but told me to stay until Thursday, and they would take some cotton to town, and they would take me home then. I did not go home with the French lady when she took the letter, because I could not. I did not tell the French lady anything about what had happened, because he threatened to kill me; and he took the letter to her himself. That was on Saturday, and I went home on Thursday following.

I did not tell my sister anything about what happened to me, because if I told her, she would go and tell him, and then he would kill me. On Wednesday, the day before I went home, and while my sister and Marcario and myself were sitting out in the yard, I did not leave the place where I was sitting and move my chair close up to where he was, and lay my head in his lap. I did not lay my head on his shoulder, either. After this occurrence I did not kiss him as a brother-in-law as I did before. Before this I had kissed him like a brother-in-law, because I respected him like a brother. I kissed him and hugged him and respected him like a brother. After this occurrence I was not affectionate with him, and I did not kiss him or put my head on his shoulder. I will swear that positively. Never, on Wednesday before I went home, nor at any other time from Friday to Thursday, did I treat him as I always had. I never kissed him afterwards, and I never told this to anybody at all. Previous to that time I had treated him as a brother, and kissed him and hugged him, but after that I did not.

I could not tell you which direction I live from Marcario by that drawing that you have. I don't understand anything about drawing, but I live, more or less, about six or seven miles from where Marcario lives. There is a lot of prickly pear there where you speak of, but it is not so thick that you can't go through. I could not tell you in which pasture this offense was committed. We went into the pasture down the railroad the second night; we left the railroad somewhere by the bridge. It is

about three or four miles from Marcario's house to the Salado, down by the lane. I don't know what distance it would be to my home around that way, but he wanted to take me that way. I don't recollect whether on the habeas corpus trial I testified that on Friday night Marcario took me to the same place that he did on Tuesday night, or not. I testified nothing but the truth. I never said he carried me there more than once. Marcario did not have any horses at home on Tuesday, the 22nd of August. He did not have any conveyance of any kind. He has got one old mare, and that runs in the pasture. He did not have a conveyance there on Friday either.

On redirect examination, she testified: On Tuesday night, before this happened, he started home with me. He said that he did not want the people along the road to see that he made me walk, and he would carry me the nearest way through the pasture. It was on the way home that he insulted me. He asked me on the way home if I was mad, and I told him no; and he said, "Let us rest awhile." Two or three hours before he started to take me home on Tuesday, he came up and started to bite my cheek, and I drew back from him, and he got mad and told me I must go home, and he started home with me, but he stopped on the way and asked me if I was mad yet. It was not right there that he insulted me, but later on that evening he did insult me. When he insulted me I cried. After we started back home he said, "Poor Polly, I feel sorry for you, but I had to do it." He told me he was paid for insulting me; he said he had said it to me just like he would to his sister. I still had confidence in him after that, and we started back home, and that evening he told me to tell my sister that we got lost and could not find the way. The next time that he started home with me was on Friday. That was before night. He said this young man to whom I was engaged to be married would meet me right at the tree where they had killed a 'possum once. He said the young man was waiting there to speak with me before he carried me home, and we went there and waited until nearly night; and when it became night I told him that I wanted to go on home, and he started with me, and I thought he was carrying me home. When I told my mother what happened she came here and filed this complaint. We came right down in the evening and filed this complaint.

On recross-examination, witness testified: On Tuesday afternoon he tried to bite my cheek, and my sister Clara, his wife, was there; she was right there, and he tried to bite my cheek, and I drew back from him, and it made him mad. I have hugged him and kissed him as a brother. After this occurred I started home with him because he got mad and said he was going to take me home. The reason I did not ask my sister to go home with me after he had insulted me in that pasture was because I had more confidence in him. I was not the boss of my sister; he was the

boss, and if I asked her it would not make any difference. He did not want to take her along. All this occurred in Bexar County and State of Texas. I was lying down when this outrage was committed. I had to get down, because he threatened to kill me. He had one arm around my neck, and in one hand he had the knife. I don't know which hand. The hand of the arm around my neck was the one he held over my mouth. I do not know which hand it was he had on my mouth. It was a pocket knife that he had. I don't know what sort of a handle it had. I did not see the handle. I had seen the knife before, but I do not know what kind of a handle it had. I do not know how long was the blade of that knife; it was a common pocket knife—a gentleman's knife. Don't know how many blades it had. I may have seen him cut things around the house with it, but I never noticed the knife. At the very time he committed this act I do not know where he had the knife, but I guess he had it in his hand. I was trying to hold him off with my hands, but it did not do me any good, because he said he would have his wish, and have his wish he did. I held him back with my hands. I had my hands on his breast. I don't know where he had the knife at the time he committed this act, but I guess he had it in his hand, because he said he would kill me if I did not give up. I did not see the knife at the very moment he committed the act.

I could not tell you just what time of day it was when he started to bite my cheek; it was in the evening; it was about 3 or 4 o'clock, more or less; they did not have any timepiece. We started home after that, sometime before sundown, but not very long before. I do not know what time we got back to his house on Tuesday night. I was excited, and I could not know the time. I could not tell how long it took us to walk there and back. I said we started home before sundown, and I don't know when we got back; I don't know just what hour it was.

The testimony of Dr. Clifford, which was objected to by defendant, shows that he (the doctor) was county physician, and at the instance of the attorneys for the prosecution he had examined the prosecutrix on the morning of the day he testified, and found the hymen ruptured, and the vagina had been penetrated.

The defense was an alibi, and was fully sustained by the testimony of defendant's witnesses.

The case is one where the evidence for the State and that for the defense is in direct conflict.

*J. M. Eckford,* for appellant.— 1. The court erred in refusing special charges numbers 1, 2, and 5, asked by defendant, as follows:

"1. The defendant asks the court to charge the jury, that the party ravished may give evidence upon oath, and is in law a competent wit-

ness, but the credibility of her evidence and how far she is to be believed must be left to the jury, and is more or less credible according to the circumstances of fact that may concur in that testimony.

" 2. The defendant asks the court to charge the jury, that where the charge is rape, and the testimony of the injured party is unsupported by other evidence, it weakens her credit, but how far she is to be believed is left with the jury; the evidence, however, must be sufficient to satisfy the jury of the guilt of the accused, giving him the benefit of the doubt as in other cases, whether she is supported by other witnesses or not."

" 5. Defendant asks the court to charge the jury, that though a conviction for rape may be had upon the uncorroborated testimony of the injured female, yet such a case requires special scrutiny by the jury and a careful weighing of the evidence by the jury, with all remote and near circumstances and probabilities; and that in the absence of direct evidence or circumstances corroborating the testimony of the injured female, the jury should acquit, unless all the facts detailed by such injured female concur to establish the guilt of the defendant beyond a reasonable doubt."

2. The court erred in admitting the testimony of Dr. Clifford, because the examination he says he made was made two months and twenty days after the day of the alleged rape, and was too remote from said last date to afford any satisfactory evidence of the fact sought to be proven by this witness; and because said examination was made without the knowledge or consent of defendant, and without any order of court, and at a time when it was impracticable for defendant or his counsel to procure the testimony of other physicians in rebuttal.

3. The court erred in admitting the testimony of Dr. Clifford as to the condition of Paula Boeck's privates, because said testimony was not in rebuttal of any testimony offered by defendant. At about 9:30 o'clock of the second day of the trial of this case, counsel for the State, while defendant and his counsel were in the court room, procured the services of Dr. Clifford, the then homœopathic county physician of Bexar County, and without the order or permission of the court, and without any notice to defendant or his counsel, had an examination made of the alleged injured female. This was two and two-thirds months after the said defendant knew her carnally.

4. The court erred in refusing to permit the defendant to reintroduce witness Clara Gonzales, and to show by her that she washed the girl's clothes on Monday, August 28, 1893, and that no blood was on them, because the argument in the case had not been closed when said witness was asked to be reintroduced, and because said testimony was highly important to the defense.

*R. L. Henry*, Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—This conviction was for rape, the punishment being assessed at confinement in the penitentiary for a term of twenty-five years.

Appellant requested the court to instruct the jury, in effect, that the prosecutrix is a competent witness, but her credibility and the credence to be given her evidence is a matter for the determination of the jury, and her credibility depends upon the facts and circumstances adduced in evidence; and if her testimony is unsupported by other evidence, her credit would thereby be weakened; and while a conviction may be had upon her uncorroborated statement, yet in such case special scrutiny and a careful weighing of the facts is demanded, and all the circumstances and probabilties, near and remote, should be carefully looked to, and in the absence of direct evidence or corroborating circumstances the jury should acquit.

The charges being refused, exceptions were reserved. In this there was no error. They were clearly upon the weight of the testimony, and therefore violative of the statute prohibiting the court from so charging. While courts have been cautious in sustaining convictions for rape upon the uncorroborated testimony of the ravished party, yet this is only the case when her evidence is suspicious in its nature or doubtful in its character. This goes, when the question is raised, only to the weight of the evidence. It is not a question of law, but pertains to the effect of the evidence.

The defendant having closed his testimony, the State was permitted to prove by Dr. Clifford that he, on the morning he was testifying, had made an examination of the prosecutrix, and had discovered the vagina had been entered by the male organ or some foreign substance. It was no objection to the admission of this evidence that the alleged rape had occurred two months or more prior to such examination; nor was the position well taken that the evidence was not admissible in rebuttal. Either party may be allowed to introduce testimony " at any time before the argument of a cause is concluded, if it appear necessary to a due administration of justice." Code Crim. Proc., art. 661. This exercise of the discretion of the trial judge in receiving evidence before the argument is concluded, will not be revised on appeal, unless it should reasonably appear to have been abused. Willson's Crim. Stats., sec. 2311.

Pending the argument, counsel for the defendant offered to reintroduce Clara Gonzales, wife of defendant, for the purpose of proving by her, that " on the Monday following Friday, August 25, 1893, she and Paula Boeck, the prosecuting witness in this case, washed Paula Boeck's underclothing, and there was no blood on them, and nothing unusual about them. That there had been no washing done by witness or Paula Boeck, who stayed at witness' house from the 25th of August until said Monday, the 28th of August, 1893." This was offered " in view of Dr. Clifford's testimony, which was a surprise to defendant." As the matter is pre-

sented by the bill of exceptions, the ruling is not shown to be erroneous. It was wholly immaterial that Paula Boeck's "underclothing" were washed at the time stated, unless they were those worn by her at the time of the alleged rape. We are not to presume, in aid of the bill, that it was meant to point out the particular garments worn by the prosecutrix on the occasion of the alleged rape. Inferences will not be indulged to supply omissions in a bill of exceptions. Its allegations must be so full and explicit that the matters presented for revision may be understood without recourse to inference. Willson's Crim. Stats., secs. 2368, 2516.

If the juror Holmgreen made any statement to the other members of the jury in regard to the good character of the prosecutrix, it was after the jury had determined the defendant's guilt unanimously, and such statement could have had no possible effect upon any juror in arriving at his verdict.

It is urged that the evidence fails to support the conviction. If the evidence for the prosecution is true, defendant was unquestionably guilty. If the testimony for the defense was correct, he was not. The witnesses were before the jury, and their credibility was passed upon by that body. Where the evidence for the State proves the allegations in the indictment, and is sufficient to support the conviction, we do not feel authorized to reverse the judgment because the defendant's evidence is totally at variance with the State's case. We do not feel justified in setting aside the conviction on this ground.

The judgment is affirmed.

*Affirmed.*

Judges all present and concurring.