## WILL EDMONDSON V. THE STATE.

### No. 10586.  Delivered March 9, 1927.

**1.—Murder—Dying Declaration—Predicate for Introduction—Rule Stated.**

Where, on a trial for murder, the state offered to prove by a witness the dying declarations of the deceased, the appellant moved the court to withdraw the jury and hear evidence on the predicate, this should have been done, and should be done in every case, before a dying declaration is admitted.

**2.—Same—Continued.**

"When such testimony is offered, the jury should be excluded from the court room, and the preliminary evidence heard by the court alone.  If found irrelevant and inadmissible, the question is determined free from all prejudice in favor of or against the accused.  If found relevant and admissible, then on the return of the jury, the testimony should be offered *de novo*, in the presence of the jury."  Wharton's Crim. Ev., 3rd Ed., Vol. 1, p. 528, 'Sec. 275b.  See also Couch v. State, 245 S. W. 692.

**3.—Same—Evidence—Dying Declaration—Withdrawing From Jury—Error Not Cured.**

Where a witness had testified to a proper predicate for introducing a dying declaration, and then testified that deceased had stated in his dying declaration that appellant killed him, but on cross-examination admitted that it was he who had told deceased that he was going to die, and that "everyone knew Will Edmondson did it, and you do, too," to which the deceased nodded his head in an affirmative manner, such testimony should not have been admitted, and the error could not be cured by instructing the jury to disregard it.

**4.—Same—Continued.**

Our statute declares that before a dying declaration can be admitted in evidence, it must be shown as a predicate, "That such declaration was not made in answer to interrogatories calculated to lead the deceased to make any particular statement."  The evidence admitted in this case was offensive to this statutory requirement.  See Art. 725, Subdiv. 3, C. C. P., 1925.

**5.—Same—Continued.**

Notwithstanding the effort of the court to withdraw the effect of this

erroneously admitted dying declaration, it is not probable that its effect could have been eliminated from the mind of the jury. "If the illegal testimony admitted over the objection of the defendant was of a material character, and was calculated to influence or affect the jury adversely to the defendant, the withdrawal of the same will not cure the error in admitting it. Branch's Ann. P. C., Sec. 383. Also see Williford v. State, 36 Tex. Crim. Rep. 414, and Wade v. State, 88 Tex. Crim. Rep. 372.

**6.—Same—Accomplice Testimony—Corroboration—Held Insufficient.**

The state relied for a conviction in this case upon the testimony of an avowed accomplice, Fred Funston. Aside from the purported dying declaration, which was erroneously admitted, the record fails to disclose any corroboration of this accomplice testimony, and for other errors pointed out the cause must be reversed and remanded.

Appeal from the District Court of San Saba County. Tried below before the Hon. J. H. McLean, Judge.

· Appeal from a conviction of murder, penalty life imprisonment in the penitentiary.

The opinion states the case.

*J. H. Baker* of San Saba, for appellant.

*Sam D. Stinson,* State's Attorney, and *Robert M. Lyles,* Assistant State's Attorney, for the State.

MORROW, PRESIDING JUDGE.—The offense is murder, punishment fixed at confinement in the penitentiary for life.

Fred Bollinger was an unmarried man, something over fifty years of age. He resided upon a farm in a small house about three-quarters of a mile from the home of the appellant, who also lived on a farm. On the morning of November 11, Bollinger was discovered lying on his bed suffering from a gunshot wound in his breast. Near the bed was a .38-caliber pistol from which two shots had been recently fired. There was evidence that the wound upon Bollinger was inflicted by a bullet fired from a .38-caliber pistol. There was also evidence that there was a bullet hole through the roof of the dwelling. The evidence was conflicting touching the powder burns upon the shirt and undershirt which were worn by Bollinger.

Shaw, the person who first arrived, testified that Bollinger raised the cover to reveal the wound; that there were no powder burns or holes through the bed cover; that Bollinger said there was no use to send for a doctor. After the arrival of Shaw, the witness Jones arrived, and later several others, including the doctor, who examined the wound. Bollinger gave Jones some money and directed that it be given to relatives. He stated in

the presence of Shaw, Jones and several other witnesses that he did not know who shot him; that he was shot while he was asleep. The bullet entered slightly below the left nipple and ranged outward and upward on the same side of the body and located under the skin below the left shoulder blade. Bollinger was removed to a sanitarium in Brownwood, where he died on the 17th day of December.

The appellant was interested in having the commissioners' court authorize the creation of a road a part of which would pass through the land of the deceased. The deceased was not willing that the road be created, and appellant had expressed some dissatisfaction in this attitude and said he would give $500.00 if some one would buy the property of the deceased. Some time antecedent to the death of the deceased he had impounded the appellant's hogs and the matter of the damages was arbitrated and amounted to $14.00, which the appellant paid, though, according to witnesses, he was dissatisfied with the result of the arbitration.

A witness by the name of Fred Fuston, twenty-four years of age, together with his father, worked on the shares on the farm of the appellant. This witness testified that a week or so before the deceased was shot, appellant said that he would give the witness a certain farm if he would help him to get rid of the deceased. This proposal the witness declined to consider. He testified further, however, that on the evening before Bollinger was shot, appellant said to the witness:

"We are going tonight to get shed of Fred Bollinger."

Appellant said that the witness was going with him, but the witness said he did not want to go, whereupon appellant said:

"By God, you have got to go, as you know all about it, and if you don't, I will kill you."

He told the witness to meet him between one and two o'clock at a certain designated place. According to the witness, he went to bed with his wife early in the night and slept until about twelve or one o'clock, when he got up, using care to avoid awakening his wife. He put on his clothes and shoes outside of her room and went to the place designated by the appellant. Touching what occurred, we quote from the witness as follows:

"I went on down there on that string of fence north of Will Edmondson's farm. I found Rainer Mallett and Will Edmondson sitting there. They said they were going to kill Fred Bollinger. Edmondson said that I had to kill that man. I told him that I did not want to kill that man; that he had done me no harm and that he had always been a good friend of mine. Will Edmond-

son said: 'If you do not kill that man I will kill you.' I told him that he would have to kill me for I would not kill that man; that he had never done me any harm in the world. Will Edmondson then says: 'Well, by God, I can kill that man—he penned my hogs.' We then went on down there. * * * When we got there, Will Edmondson he reached back and handed me the gun —Will Edmondson did. He said to me: 'You take that gun and go kill Fred,' and I told him that I would not do it. * * * He says: 'He has not got no chance as we have got his gun.' He said that on the Sunday evening that he and Mr. Mallett went down there and got his gun. When he handed me that gun he said: 'By God, you take this gun and go kill Fred Bollinger.' I told him that I would not do it. * * * Will Edmondson then said: 'By God, I can kill him, and if you ever tell it, I will kill you.' Well, he then went on and taken the gun. Mr. Mallett was there with me. Will Edmondson went towards the house. It was about five minutes before I heard any shooting. There were two shots fired. I do not know just how much time there was between the two shots; it was just about like this—(illustrating). The house where Fred Bollinger lived was about 40 or 50 steps from where I was standing. It was about a minute after I heard these shots before I seen Will Edmondson. * * * He said when he come back: 'Let's get away from here.' He said that he had shot Fred Bollinger."

The testimony of Fred Fuston, from which we have quoted above, is the only testimony found in the record which connects the appellant with the commission of the offense.

The witness Mallett, who was named by the witness Fuston as one of the participants in the homicide, testified on behalf of the appellant and categorically denied the truth of Fuston's testimony above mentioned. He further testified that he spent the night on which the deceased was shot at home with his wife, and she gave like testimony. This was supported by her brother, who spent the night at their house. Appellant testified denying the participation in the homicide, declaring that he spent the night at his home, and his wife testified to the same effect.

The evidence contains many matters pertaining to the theory that the shot was fired by the deceased with a suicidal intent. Among them are the declaration of the deceased to those who first came to him that he did not want a doctor; that he was not going to live; that he wanted to dispose of his money; that he did not know who fired the shot; that his clothes were powder burned; that the pistol used was his own; that the bed cover

was not powder burned or punctured by the shot. However, there were some circumstances combating such theory.

The state called the witness Jones to testify to the dying declaration of the deceased, which took place a short time before his death. Jones testified that he visited the deceased and had a conversation with him in the absence of other persons; that the deceased said he was going to die. He was then asked by state's counsel to state the conversation, when appellant's counsel interposed a request that the jury be retired so that an examination might be made in order to determine the relevancy and admissibility of the matter that the witness was about to relate. The motion being overruled, the witness said that the deceased, after stating that he was not going to get well, said that Will Edmondson, the defendant, was the man who shot him. After the witness had given this testimony, the court permitted counsel for the appellant to examine him, and it was developed that the deceased was told by the witness that he (deceased) was going to die; that he ought to tell who shot him, and said: "Every one knows Will Edmondson did it and you do too"; that in response to this statement by the witness the deceased nodded his head in an affirmative manner; that it was upon this incident that the witness had given the testimony mentioned above, namely, that the deceased had stated that the appellant had shot him. The witness also testified that the deceased inquired "if Will Edmondson had been arrested yet." Upon the request of the appellant's counsel, the court withdrew from the jury the part of the witness' testimony to the effect that the deceased said that the appellant shot him and instructed the jury to disregard it, but refused to withdraw the remainder, that is, the inquiry as to whether Will Edmondson had been arrested. The testimony of the witness, which was withdrawn, was manifestly not admissible. The statute declaring what must be shown as a predicate says:

"That such declaration was not made in answer to interrogatories calculated to lead the deceased to make any particular statement." (Art. 725, subd. 3, C. C. P., 1925.)

The evidence given by Jones was, we think, offensive to this statutory requirement. The part of the declaration which was admitted in evidence, we think, was not the proper subject of a dying declaration, which is confined to those declarations which relate to the circumstances of the death of the declarant. See Wharton's Crim. Ev., 3rd Ed., Vol. 1, Sec. 288.

The difficulty in which the trial judge found himself and which rendered it necessary for him to undertake to withdraw the tes-

timony might have been averted had he acted favorably upon the appellant's request that the proper inquiry touching the admissibility of the purported dying declaration be made in the absence of the jury. Courts have often called attention to the wisdom of such procedure as was done in Couch v. State, 245 S. W. 692. On the subject we take the following quotation from Wharton's Crim. Ev., 3rd Ed., Vol. 1, p. 528, sec. 275b:

"When such testimony is offered, the jury should be excluded from the court room, and the preliminary evidence heard by the court alone. If found irrelevant and inadmissible the question is determined free from all prejudice in favor of or against the accused. If found relevant and admissible, then, on the return of the jury, the testimony should be offered *de novo* in the presence of the jury.

"No reason can be adduced why this commendable procedure ought not to be enforced in every case, and there is every reason why it should prevail as the established practice of the trial court.

"Dying declarations have every element of dramatic evidence. As the last utterance of a sentient, conscious being, standing on the threshold of eternity, they possess an impressiveness out of all proportion to their evidentiary value. In all homicide cases, the elemental passions are at any moment apt to override the judgment. A court may be judicial and impartial, and a jury dispassionate, up to the point where the dying declaration is admitted, and then find its impartiality and self-restraint seriously tried over the recital of the dying declaration."

In the notes are many cases illustrating the text.

The record in the present instance is peculiar in many respects. Aside from the testimony of Fred Fuston, from which quotations have been taken, the state seems to rely upon the testimony of the witness Smith to the effect that some four or five months after the death of the deceased the appellant came to the witness and said:

"I am accused of being a Ku Klux and being a murderer, but I still have my honor. They come and got Fred Fuston this evening and taken him to San Saba and put him in jail."

The witness called attention to the fact that the sheriff was around in the village, and when the parties separated, appellant said:

"I believe Fred is all right, but if I could get a chance I would say to Herman I believe Fred is all right. I would whisper to

Herman to stand pat—I would go by and if I got a chance I would say to Fred that everything was all right and to stand pat."

Appellant denied the details of this transaction and said that Fred Fuston, who was a tenant on his farm, was threatened with some prosecutions with reference to being drunk and that such conversation as he had with Smith was with the view of showing a friendly interest in Fred Fuston. The witness Fred Fuston, who testified that after trying to get him to kill the deceased the appellant did so himself, was an accomplice witness, and the jury was not authorized to convict upon his testimony unless corroborated. See Art. 718, C. C. P., 1925. This was recognized by the learned trial judge, and the jury was instructed that to warrant a conviction there must be other testimony than that of Fred Fuston, which other testimony must tend to connect the appellant with the offense charged. It is contended by the appellant that the record is without such additional testimony. Upon that subject we deem it unnecessary to express an opinion further than to say that the dying declaration which the witness Jones imputed to the deceased impresses us as the most cogent corroborative testimony to be found in the record, and that having been excluded by the court, it could not be regarded on appeal as tending to connect the accused with the commission of the offense. That it might have been so regarded by the jury, however, notwithstanding the effort to withdraw it, seems more than probable. Mr. Branch, in his Ann. Tex. P. C., Sec. 383, says:

"If the illegal testimony admitted over the objection of the defendant was of a material character and was calculated to influence or affect the jury adversely to defendant, the withdrawal of same will not cure the error in admitting it."

Many authorities are collated under this proposition. See Williford v. State, 36 Tex. Crim. Rep. 414; also Wade v. State, 88 Tex. Crim. Rep. 372.

In the light of the record before us, the testimony of the witness Jones going to show that the deceased stated in his dying declaration that the appellant shot him was material to a degree that its effect upon the jury could not be removed by the admonition of the court to the jury that they should not consider it. As stated above, it was the most tangible fact upon which the jury could seize to corroborate the accomplice witness Fuston.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*