WILL EDMONDSON v. THE STATE.

No. 12567.   Delivered March 12, 1930.
Reported in 26 S. W. (2d) 220.

The opinion states the case.

*J. F. Taulbee* of Georgetown and *J. H. Baker* of San Saba, for appellant.

*G. A. Walters* of San Saba, and *A. A. Dawson* of Canton, State's Attorney, for the State.

MORROW, Presiding Judge.—The offense is murder; punishment fixed at confinement in the penitentiary for life.

Fred Bollinger lived alone in a house on his farm. One morning he was found suffering from a gunshot wound in his breast. Near the bed was a .38 calibre pistol from which two shots had been recently fired. The wound was one inflicted by a bullet of that calibre. There was also a bullet hole through the roof of the dwelling. Touching the presence of powder burns upon the apparel worn by the deceased the evidence is conflicting. The first person to arrive was Shaw, and later, Jones. The wound was near the left nipple and ranged outward and upward in the same side of the body. The bullet was located under the skin below the left shoulder.

The principal witness for the State was Fred Fuston, who testified in substance that late at night, by appointment, he met the appellant and one Mallett; that the appellant had previously threatened to kill the witness unless he killed Bollinger. At the meeting mentioned the witness refused to kill Bollinger, and the appellant, urging him, said, "You take that gun and go kill Fred. * * * He has not got no chance as we have got his gun." Appellant said that he had Bollinger's gun; that he had gotten it on Sunday evening; that Bollinger could not do anything. After Fuston declined, appellant said that he would kill Bollinger. Appellant then took the gun and went in the direction of Bollinger's house. About five minutes later the report of two shots was heard. The distance separating the parties was about 40 to 50 steps. Soon after the shots were fired, appellant appeared and said that he had shot Bollinger. The truth of Fuston's testimony was controverted by circumstances. A more comprehensive statement of the evidence is embraced in the report of the former appeal in 106 Tex. Cr. R. 321, also in the second appeal of the case, in 6 S. W. (2d) 119.

The evidence upon the present appeal deviates in some particulars from that in the former appeals, not, however, to a degree rendering necessary further recitals than appear above and in the discussion following.

Two State's witnesses, Shaw and Jones, having an appointment with Bollinger, went to his home on the morning of the 10th of November. Shaw arrived a few moments in advance of Jones. Later, a justice of the peace, the sheriff, a constable and deputy sheriff arrived, also a doctor. About two or two and one-half hours after the arrival of Shaw, Bollinger was taken to a hospital. The transactions and conversations which are made the subject of the bills of exceptions discussed herein all took place apparently an hour or more prior to the removal of Bollinger to the hospital.

Jones testified that Bollinger was lying wounded upon his bed as above described. He was bleeding and suffering at the time. The witness discovered a .38 calibre pistol lying upon the floor upon a pair of old trousers. The pistol was picked up and examined. The shells therein were also examined. He gave testimony as to their condition and said that he found two empty shells and three loaded ones; that some of the loaded ones appeared to have been snapped. Jones delivered the pistol to either Urquhart, the sheriff, or the justice of the peace. Upon suggesting that a doctor be called, Bollinger said that it was useless as he could last but a little bit; that he could not last long and that it was no use. The deceased delivered his money to the witness Jones and asked that the money possessed by him be divided among certain persons whom he named.

There is a bill of exception complaining of the action of the court in excluding the declaration of the deceased. Urquhart, the sheriff, testified in substance that he found a pistol on the floor on a pair of pants about two feet from the side of the bed upon which Bollinger was lying; that he picked up the pistol, examined it, and by experiment determined that it had been recently fired. He noticed that there were shells in it, two of which were empty and two that had not been fired. The shells were of a .38 calibre. He said, "I took charge of the gun and showed it to Mr. Bollinger." He also testified that there was taken from the body of the deceased a .38 calibre pistol bullet. This was exhibited to the jury, as were the shells and the pistol upon the identification of Urquhart. On cross-examination the sheriff stated that at the time he picked up the pistol, examined it and showed it to Bollinger, he had a conversation with Bollinger with reference to the pistol. Quoting him, he said: "I had a conversation with him as to whose pistol it was." The appellant sought to elicit from the witness the statement or declaration which was made by the deceased at the time the pistol was exhibited to him. This, upon objection of the State, was excluded

upon the ground that it was not shown to have been a dying declaration or res gestae. The witness would have testified that he was told by Bollinger that the pistol belonged to him; that it ought to have been under his pillow as he put it there the night before. As shown by other bills of exception the appellant sought to make like proof by the witnesses Gibson and Chamberlain, that is to say, proof that they saw Urquhart show the pistol to Bollinger and heard the conversation. Each of said witnesses would have testified to the remark made by the deceased in substance as would have Urquhart; that is to say, that Bollinger said that the pistol belonged to him; that he had put it under his pillow on the previous night.

The qualification of the bill complaining of the rejection of the testimony of Urquhart to the declaration of Bollinger is in substance that the record shows that Shaw was the first person to reach the deceased; that some conversation took place; that Urquhart's arrival was subsequent to that of Shaw. The qualification refers to the record. From the record it appears that when Shaw entered the house and found Bollinger in bed, he remarked that he was sleeping late; that he must have been out late. Bollinger replied, "I am shot." Shaw specifically said that no other words passed. at that time, and further said that in a few moments Jones entered, and a short time thereafter Urquhart, the sheriff, and Chamberlain came in together. The witness said that he did not see the pistol until Jones came.

The record has been examined with the results heretofore stated in substance and makes it clear that Shaw (the first witness) did not see the pistol until after Jones' arrival and that neither Shaw nor Jones nor any other witness did anything with the reference to the pistol until after the arrival of Urquhart, the sheriff. Touching the admissibility of the declaration under the so-called rule of res gestae, it may be said that the rule is much broader and far more elastic than as originally in the Common Law. See Wharton's Criminal Evidence, (3rd Ed.) Vol. 1, p. 490, sec. 262; Jones v. State, 11 S. W. (2d) 798. The formulation of a fixed standard governing the receipt or rejection of testimony, under the rule of res gestae as it exists in this state, is extremely difficult, if not impossible. It is well understood, however, as is stated in Nami's case, 97 Tex. Cr. R. 531, that "many authorities hold that when a condition of suffering exists from the infliction of the injury to the making of the statement in a given case it might extend far

enough to preclude premeditation and in cases of this kind we have declined to be limited to any specific time," citing Tooney v. State, 8 Tex. Cr. App. 459; Fulcher v. State, 28 Tex. Cr. App. 471, and numerous other decisions.

In the present instance, according to the undisputed evidence, it is stated in substance that the deceased said that medical aid was useless; that he would not last long; that he wanted his money delivered to persons which he named. It was shown that the deceased was suffering from a serious wound and from shock, was in pain and was bleeding. His condition was serious to a degree that physicians advised that he be removed to a hospital, where he subsequently died from the effects of the wound. If, under the circumstances disclosed by the record, the deceased had stated facts leading to the conclusion that the pistol belonged to the appellant, it is believed that there are many precedents (some of which have been listed above) which would have justified the court in receiving the declaration in evidence against the opposition of one accused on trial. As shown in the beginning of this opinion, the State introduced evidence from the witness Fuston to the effect that a few moments before the firing of the shots as claimed by him which wounded the deceased, the appellant, while endeavoring to get Fuston to kill the deceased, stated to Fuston in substance that the pistol of the deceased was in the hands of the appellant, as he had gotten it on a Sunday previous. The State further proved by Fuston that after he refused to take the pistol proffered by the appellant and kill the deceased, the appellant then took the pistol and went to Bollinger's house with it. It is obvious from this testimony that it was intended to show that the appellant at some time before had disarmed the deceased, gotten possession of his pistol and used it in shooting the deceased. The proffered testimony was in conflict with this theory advanced by the State through the testimony of the accomplice witness and went to show (as the declaration would have disclosed) that at the very time the State's witness claimed that the appellant was in possession of the pistol of the deceased (or claimed to be), it was under the pillow on the bed upon which the deceased was sleeping, having been placed there by him. It is hard to conceive that any rule of evidence devised for the purpose of eliciting the truth and aiding in the administration of justice, would reject the declaration of the deceased under the circumstances disclosed by the record. If it should be held that the declaration under consideration was not by the record shown to come within the rule of res

gestae, there are other recognized exceptions to the rule excluding hearsay declarations which are worthy of note. Among these is the rule recognized by all courts and text-writers giving one against whom a part of an utterance or transaction is introduced the privilege of introducing the remainder. See Wigmore on Ev., 2nd Ed., Vol. 4, Sec. 2113; also Vol. 3, sec. 1786. This principle has found expression, and to some extent extension, in our own statutory law, as manifested by Art. 728, C. C. P., 1925, which reads as follows:

"When part of an act, declaration, or conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other, as, when a letter is read, all letters on the same subject between the same parties may be given. *When a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood or to explain the same may also be given in evidence.*"

To the mind of the writer, the *act* of the witness in showing the pistol to Bollinger, and the statement of Bollinger of *"something about who owned the pistol,"* all of which was put in evidence, rendered competent proof by the accused of the words used by Bollinger, namely, "that the pistol belonged to him, and was placed by him under the pillow on his bed on the night on which he was shot." The materiality of the testimony, as above explained, is not open to question. In denying to the accused the privilege of making the proof, the law set out in the statute (Art. 728) was transgressed and the rights of the accused abridged to his injury. The announcements in the precedents, as well as the terms of the statute itself, lead us to conclude that in refusing to receive in evidence the testimony of Urquhart, the sheriff, repeating the words of the deceased, Bollinger, explanatory of the presence of the pistol in his domicile and near his bed, the learned judge who presided at the trial of the accused overlooked or misinterpreted the effect of the statute in question, and that the error in so doing is substantial in that it deprived the accused of an item of evidence of vital importance in meeting and counteracting the theory of the State. Some of the precedents to which reference is made are Green v. State, 17 Tex. Cr. App. 395; Bonnard v. State, 25 Tex. Cr. App. 196; Lawler v. State, 9 S. W. (2d) 262.

Because of the rejection of the testimony mentioned, we are constrained to order the reversal of the judgment of conviction and to remand the cause for another trial.

*Reversed and remanded.*

296

LATTIMORE, JUDGE.—I can not agree to a reversal of this case for the reasons stated in the opinion of my Brother Morrow. There was no defense of alibi, as he states in his opinion,—in fact no witnesses were offered for the accused, and no such defense developed from any of the State witnesses. The State proved motive overwhelming, opportunity, threats, and by one who is barely an accomplice, if at all,—the actual killing of deceased. In the opinion of the writer this witness was amply corroborated. The record seems wholly bare of any suggestion of suicide by deceased, save the statements of appellant himself to three witnesses the day after the shooting to the effect that he guessed deceased shot himself. No illness, poverty, lack of friends or home on the part of deceased, appears. Nor is there any statement of his in the record bearing out any such theory, unless the fact that he thought himself so fatally hurt as to not care for the services of a doctor, and that he saw no need for the sending of officers,— be given such construction.

The deceased was shot, according to the testimony of Fuston, the alleged accomplice, about 1 o'clock A. M. November 10, 1925. The bullet entered below the ribs on the left side and ranged so far up as to be cut out under the point of the left shoulder blade,—a wound seemingly incompatible with the act of one who deliberately plans or attempts to take his own life, with no time limit, excitement or reason why he should not shoot himself in the head or through the heart; a wound so difficult of accomplishment by the hand of a suicide as to negative the diaphanous theory of a self-inflicted wound. There is not the slightest suggestion of derangement of the mind of deceased, nor arrangements of his affairs, notwithstanding he had lands, moneys on hand and owing to him, and that the families of several brothers lived in the vicinity. He said to the two men who first reached his home about 8:00 or 8:30 A. M. of the morning after he was shot and found him in bed wounded, in reply to a question put by one of them as to who shot him,—that he did not know, that he was asleep, that he only heard the door slam. He lived for weeks, but no efforts were made to prove any statement ever made by him indicating suicide. The contrary of this appears from the opinion of this court on former appeal. Edmondson v. State, 106 Texas Crim. Rep. 325.

The State's theory was that appellant was angry with deceased because the latter had killed a hog of appellant, and later impounded

a bunch of hogs belonging to him, for which appellant had to pay damages. It was shown by the constable of the precinct that when this damage was paid, appellant was very mad and insisted that deceased should pay him for the hog the latter had killed, appellant saying if the law did not protect him he was going to take the law in his own hands. Further, that on the afternoon before the killing that night appellant came to see said officer and wanted papers for deceased, or to file complaint against him for killing said hog, but the justice was not there.

Further it was shown that appellant and Mallett were trying to have a road put through the premises of deceased which he was opposing, and that appellant had said he would give $500.00 to anyone who would buy deceased out; that appellant had said he would like to shoot deceased just to see him fall; that on Monday before the shooting that night appellant and Mallett went to San Saba trying to get said road through but did not succeed. The next morning after the shooting appellant and Mallett rode by the field of witness Owen, who favored said road, called to him and said they expected to get the road through now, or today. Tracks of two men going from the home of deceased were traced the morning after the shooting, and one of them was shown to correspond with Mallett's shoes. Appellant and Mallett were seen by several witnesses near the house of deceased late Sunday, before the killing Monday night,—one witness saying that he saw them there as late as 6 o'clock. Fuston, the alleged accomplice, said that following appellant's threat to kill him if he did not go with appellant to the home of deceased, he went with appellant and Mallett about 1 o'clock Monday night to a point near the home of deceased. Here he and Mallett stopped. Appellant showed witness a pistol and handed it to him and wanted him to go and kill deceased. Witness refused. Appellant took the pistol and turned away toward the house. In a few moments two shots were heard. Appellant came back and said he had killed deceased, and the three went home. In addition to the wound and bullet in the body of deceased, a freshly made bullet hole was discovered in the roof of the house over the room in which deceased was lying at the time he was shot. A brother of Fuston,—Herman Fuston,—testified appellant asked him the next morning if he heard shooting the night before. Mr. Smith testified that appellant came to where he was about the time the grand jury met after the killing, and wanted him to go to town and make a chance to walk past Fred Fuston and say: "Fred, stand pat," and to walk past

Herman Fuston and say: "Herman, stand pat." That appellant came to see Smith on this occasion and took him off to one side, was verified by other witnesses. The Fuston boys had been summoned before the grand jury at the time appellant went to see Smith. Two witnesses testified that appellant told them after the killing, that he would give any man $500.00 to swear that he, appellant, stayed all night at his house the night of this killing. Neither appellant, nor anyone for him, nor Mallett, nor anyone for him, gave any testimony upon this trial. These are some of the cogent facts making evident the reasons why three juries have found this appellant guilty and have given him severe penalties.

My Brother Morrow thinks this case should be reversed because the trial court refused to allow the defense to show by Sheriff Urquhart that sometime (when is not shown) after he got to the scene of the killing about 9 A. M. November 10th the deceased had a conversation with him relative to a pistol which had been found by the first two men to reach the scene on the floor east of the bed occupied by deceased, about two feet from the bed; the muzzle pointing toward same,—and that in said conversation deceased stated that said pistol belonged to him, and ought to have been under his pillow, as he put it there the night before. It was shown that two empty cartridges and two or three loaded ones, *all of which had been snapped,* were in the cylinder of this pistol. The bed of deceased was in the southwest corner of the room which had no windows and but one outside door.

Fred Fuston, the alleged accomplice, testified as follows:

"Just before he started or just at the time that he handed me that gun, he said something about whose gun it was. He said that he had his gun and he couldn't do anything with us. He said that he got it on the Sunday evening before the killing was done on a Monday night."

He further said he saw no pistol after appellant came back from the house of deceased after the shooting. The bullet taken from the body of deceased was of the same calibre as the pistol which was lying on the floor. Evidently the State's theory was that appellant used this pistol in the shooting.

Two questions arise,—one as to the sufficiency of the bill; the other as to the pertinence and admissibility of the offered testimony. The bills presenting these objections show that appellant did not state to the court the object and purpose of the desired testimony. This is always held necessary unless same be obvious. Walker v.

State, 28 Texas Crim. App. 505; Schoenfeldt v. State, 30 Texas Crim. App. 697; Rahm v. State, 30 Texas Crim. App. 312; Coyle v.· State, 31 Texas Crim. Rep. 606; Loakman v. State, 32 Texas Crim. Rep. 562; Bailey v. State, 37 Texas Crim. Rep. 580; Rodes v. State, 38 Texas Crim. Rep. 328; Clay v. State, 41 Texas Crim. Rep. 655. It seems plain that the purpose and· object of this rejected testimony was not obvious. Nor will the relevance and materiality of rejected evidence be left to inference. The bill must make evident its materiality. Davis v. State, 14 Texas Crim. App. 655; Buchanan v. State, 24 Texas Crim. App. 200; Gonzales v. State, 32 Texas Crim. Rep. 620; Cline v. State, 34 Texas Crim. Rep. 348. The bills wholly fail to do this.

Turning to the other question, i. e., the pertinence and materiality of the testimony rejected,—suppose deceased had a 38 calibre pistol, and that he had put it under his pillow the night before he was shot, and that this was the pistol found lying a couple of feet from his bed the next morning with two exploded and three loaded cartridges in its cylinder,—would that have in any degree exculpated appellant? Certainly not. Suppose the State or the defense had established by witnesses who were present when deceased retired the night before he was shot, that they saw him put under his pillow the very pistol found by his bed the next morning, would this fact support any theory inconsistent with appellant's guilt? If so, it is not perceived. The State's case depended on the jury's belief that the accused after midnight entered a room unlighted by a single window, and in the darkness located a man, who himself says he was asleep, upon a bed, and in the darkness fired and inflicted the fatal wound upon said man. Under such circumstances it would not appear very difficult to get a pistol from under the pillow of the sleeping man, and use it. How easy for appellant and Mallett,—around the little house of deceased in his absence for an hour or two Sunday afternoon before the killing Monday night, to enter and familiarize themselves with the location of the bed, the pillow and the lay of the land.

What is in the rejected testimony to shed light on any material issue in this case? If it be said that same tends to show that the statement attributed to appellant by Fuston, as above quoted, was untrue,—this would not make it material. If said statement was actually made to Fuston, it was but part of appellant's effort to get Fuston to go and kill deceased. If the statement attributed to appellant was a false statement made by appellant to induce Fuston to feel secure in going to the house and murdering deceased, this

would in no sense aid appellant's case or go to prove him not guilty. If the jury believed the statement was made by appellant to Fuston, as detailed by Fuston, they must needs have accepted Fuston's testimony as true, and if same be true there could be no question of appellant's guilt.

If it be urged that this rejected testimony lent strength to any theory of suicide, it would seem sufficient to call attention to the fact that the very statement made by deceased to Urquhart and rejected by the trial court, viz. : that the pistol found on the floor was his and *ought to be under his pillow as he put it there the night before,*— completely refutes any such far-fetched conclusion as that by this he meant he had gotten the pistol himself and shot himself during the night. There is absolutely nothing about this statement which, in the mind of the writer, even remotely tends to support any such theory.

I do not care to discuss the question of res gestae, dwelled upon by my Brother Morrow, though it seems true that under no rule or decision can what the deceased had said at least eight or ten hours after he was shot, be held admissible as res gestae. Jones v. State, 111 Texas Crim. Rep. 172, a recent case, seems to reject as res gestae a statement made the next morning after a shooting the night before. It is true the trial court rejected the proposed testimony on the ground that same was neither res gestae nor a dying declaration. The trial court did not discuss the materiality or pertinence of the rejected testimony.

The writer has considered the matter from every angle that his mind can suggest and is convinced that the bills complaining of such rejection are not sufficient to bring before us complaint of same, but if mistaken in this,—is further convinced that said testimony was neither pertinent nor material to any issue in this case. I might observe that in each of the former trials of this case this testimony was before the jury without objection, and if considered at all, same led to no different result, the verdicts being life imprisonment in one instance and a long term of years in the other. The writer would be unwilling to assent to the affirmance of any case in which testimony of a material character had been wrongfully excluded, but believing that no such case is here presented, is of opinion that the judgment of the lower court should be affirmed.